**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

THEODORE BELL,

          Petitioner,      Case No. 2:11-cv-14604

v.

STEVEN RIVARD,

          Respondent.
_____/

**OPINION AND ORDER DENYING AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND DENYING A CERTIFICATE OF APPEALABILITY**

  Petitioner Theodore Bell, a Michigan prisoner, filed this action under 28 U.S.C. § 2254. In 2010, Petitioner pleaded guilty in the Wayne Circuit Court to second-degree murder, MICH. COMP. LAWS 750.317, assault with intent to commit great bodily harm, MICH. COMP. LAWS 750.84, felon in possession of a firearm, MICH. COMP. LAWS 750.224f, and commission of a felony with a firearm. MICH. COMP. LAWS 750.227b. As a result of these convictions, Petitioner is serving an effective composite sentence of 25-to-42 years' imprisonment.

  Petitioner raises six claims in his amended petition: (1) Petitioner's trial counsel was ineffective for failing to raise the issue of Petitioner's competency to plead guilty, (2) the trial court failed to elicit a sufficient factual basis to support Petitioner's guilty plea, (3) Petitioner's counsel was ineffective for failing to conduct an adequate pretrial investigation, (4) Petitioner's counsel was ineffective for eliciting evidence of premeditation during the preliminary examination, (5) the state district court erred in

1

binding Petitioner over for trial, and (6) Petitioner's appellate counsel was ineffective for failing to obtain medical records to support the motion to withdraw the guilty plea.

The court will deny the petition because Petitioner's claims are without merit. The court will also deny Petitioner a certificate of appealability.

## I. BACKGROUND

Petitioner's convictions stem from a "drive-by" shooting occurring on April 19, 2009, in which a teenage girl was killed while sitting on a couch in her boyfriend's living room.

At Petitioner's preliminary examination, the parties stipulated that 17-year-old Kiaria Williams was pronounced dead at a hospital about five weeks after the shooting. She suffered from multiple complications during her 32-day hospitalization, as the bullet and skull fragments penetrated her brain. The medical examiner opined that she died as the result of a single gunshot wound to her head. (ECF 27-2, Page.ID.646-48.)

Officer Theopolis Williams testified that he interviewed Petitioner on July 1, 2009, after the victim's death. Though Petitioner was not placed under arrest, Williams read Petitioner his *Miranda* rights and obtained a waiver. The interview was recorded. (Id., PageID.650-653.)

Petitioner described the events leading up to the shooting:

> From a party the night before that my niece and nephew got jumped on at a hotel party. Me, Dior, Stacey, Deshawn, and Sparkel went over on Heyden. Dior gets out the car and asked one of the guys where's Girard? By then the guy came out the house and said, "Ya'll motherfuckers not supposed to be over here," and started shooting at us. I pulled Dior back in the car and I took off, I took off and went back on Mettetal. My nephew and Dior went and got me some cigarettes and then they came back and gave me my cigarettes. I ask Dior was he ready to go. We then left Mettetal and went back on Heyden. Dior got out the car and shot at least five to six times at the house.

2

> Dior jumped back in the car and we reversed backwards and went around the corner. I took Dior to Mookie's house on Rutherford and he got out and I ain't seen him since.

(Id., PageID.653-654.)

Antonio Morrow testified that Kiaria Williams was his girlfriend. (Id., PageID.658.) On the night of the shooting, he was with her at his godmother's house in Detroit. He had been outside on the porch with Kiaria when he saw Dior, Petitioner, as well as additional people drive up in three cars. (Id., PageID.659.) Dior got out of one car and asked where "G-Rock" was. Morrow said G-Rock—a person he knew—did not live there. At that point "Lo" came out of the house, told the men to go away, and discharged a shotgun toward the cars. Dior said, "I'll be back," and the men sped away in their cars. (Id., PageID.659-664.) Morrow identified Petitioner as one of the men in the cars, and he saw him holding a gun. (Id., PageID.663, 672.) One of Lo's shotgun discharges broke out the window of one of the cars. (Id., PageID.665-66.)

Morrow and Williams went back inside the house and sat on a couch in the living room. (Id., PageID.666.) Less than ten minutes later they heard gunshots coming from the front of the house, and they dove to the floor. The shots appeared to be coming from cars rolling past the front of the house, and the bullets entered through the windows and door. (Id., PageID.669.) When Morrow turned towards Williams, he saw blood running from a hole in her head. (Id., PageID.666-68.) Morrow called 9-1-1. Morrow ran outside and saw the cars he had seen earlier turn the corner. (Id., PageID.669-671.)

3

Unlike his statement to police, Petitioner told several people before and after the shooting that he was planning to, and then did, shoot at the house in question, and that it was in retaliation for Lo shooting out his car window.

Regina Hunt testified that she knew Petitioner. (Id., PageID.686.) On April 19, 2009, she spoke with him on the phone. (Id., PageID.687-689.) Petitioner was trying to find "G-Rock." (Id., PageID.691.) She arranged a three-way phone call between the groups, who exchanged angry words about the hotel party. (Id., PageID.693-95.) Later Hunt spoke again with Petitioner, who told her that someone had shot out his car window and he had just "riddled" the house. (Id., PageID.699.) Hunt understood that to mean that he had just shot at the house. (Id., PageID.699-700.)

Holly Rochon testified that she was G-Rock's mother. (Id., PageID.706.) She also knew Petitioner. (Id., PageID.707.) She spoke with Petitioner on April 19, 2009. (Id., PageID.708.) He was looking for G-Rock regarding a fight he had with Petitioner's niece. About twenty minutes or so later, Petitioner called back. (Id., PageID.712-13.) He said he "went over there and they shot my back window out. And I'm going back over, I'm going to riddle that bitch." (Id., PageID.713.) She tried to tell Petitioner that her son was not at the location. (Id., PageID.713.) Petitioner said, "Well, I'm going back over there . . . I'm going home to get my gun and I'm going back over there." (Id., PageID.713.) Rochon could not persuade Petitioner not to go back to the house. (Id., PageID.714.)

Temica Watts testified that he knew Petitioner. (Id., PageID.722.) He also talked with him by phone on the date in question when he was looking for G-Rock. (Id., PageID.725.) Petitioner said he had been shot at, and that he was going to go back.

4

(Id., PageID.728.) Watts talked to him again later, and Petitioner told Watts, "I riddled that bitch up." (Id., PageID.731.) Watts called Petitioner later and spoke with him a third time after he heard that someone had been shot at the house, but Petitioner said, "I don't know what you're talking about." (Id., PageID.729.) Petitioner said, "It wasn't me." (Id., PageID.730.)

Based on this evidence the state district court found probable cause to bind Petitioner over for trial on charges of first-degree murder, assault with intent to murder, possession of a firearm by a felon, and commission of a felony with a firearm. (Id., PageID.849-850.) Petitioner was also notified that he was charged with being a third-time habitual felony offender. (Id., PageID.850.)

Faced with this evidence, Petitioner entered an agreement to plead guilty to reduced charges on March 4, 2010. (ECF No. 27-5, PageID.855-56.) The prosecutor placed the agreement on the record. Petitioner would plead guilty to the reduced charge of second-degree murder of Kiarra Williams, assault with intent to murder Antonio Morrow, being a felon in possession of a firearm, and felony-firearm. (Id., PageID.855.) Furthermore, there was a sentence agreement of 23-to-40 years' imprisonment for the murder charge, a concurrent term of 10-to-20 years for the assault, a concurrent term of 1-to-5 years for the felon in possession charge, and a consecutive 2-year term for the felony-firearm charge. (Id., PageID.855-856.)

Defense counsel indicated that he explained to Petitioner what concurrent and consecutive sentences meant. (Id., PageID.856.) Counsel indicated that Petitioner understood. (Id., PageID.856.) Defense counsel said that he had gone over with Petitioner the rights he would be waiving, and "he understands the rights that he will be

giving up today [by] accepting this plea, and he is ready to proceed to tender a plea to the court at this time." (Id., PageID.857.)

Petitioner was placed under oath. (Id., PageID.857.) The trial court asked Petitioner whether he understood what had just been placed on the record, and that his attorney had "talked the prosecutor down from first-degree murder to second-degree murder." (Id., PageID.857.) Petitioner indicated his understanding. (Id., PageID.858.) The court asked Petitioner whether he understood that by accepting the agreement and pleading guilty he would be giving up his right to a trial. (Id., PageID.858.) Petitioner indicated his understanding. (Id., PageID.858.) Petitioner acknowledged his signature on the plea form. (Id., PageID.858.) Petitioner confirmed that he had gone over all the rights on the form with his lawyer and that he understood all of them. (Id., PageID.858.)

Petitioner denied that, other than what was placed on the record, anyone had promised him anything else or threatened him in any way to get him to give up his rights. (Id., PageID.858-59.) He indicated that he was entering his plea freely and voluntarily. (Id., PageID.859.)

The court asked Petitioner what he did to Kiarra Williams to make him believe he committed second-degree murder. Petitioner responded, "shot the house up." (Id., PageID.859.) Petitioner was asked if he was "either intending to kill or intending to do great bodily harm or create a very high risk of death or great bodily harm to those people inside?" (Id., PageID.860.) Petitioner answered, "yes." (Id., PageID.860.) Petitioner agreed that he was a convicted felon. (Id., PageID.861.)

Petitioner was then asked if he intended to kill Morrow. (Id., PageID.862.) Petitioner responded, "naw." (Id., PageID.862.) The parties agreed that transferred

6

intent from the death of Williams did not apply because assault with intent to murder required the specific intent to kill and not the possible lesser mental states for second-degree murder. (Id., PageID.862.) After a discussion, the parties agree to reduce the second charge to assault with intent to commit great bodily harm. (Id., PageID.863.) The charge also reduced the sentence agreement for that charge to 5-to-10 years' imprisonment. (Id., PageID.863.) The court accepted the plea. (Id., PageID.864.) At no point in the plea proceedings did Petitioner ever complain or give any indication that he did not understand what was happening.

Petitioner was subsequently sentenced under the terms of the agreement. (ECF No. 27-8, PageID.908-09.) At the sentencing hearing, defense counsel indicated that the sentencing report failed to indicate that Petitioner required the medications Calatpin (for blood pressure) and Remeron (psychotropic). (Id., PageID.899.) Counsel indicated that Petitioner told him that the report incorrectly stated that he had never been diagnosed with any type of mental disorder. (Id., PageID.900.) Petitioner was asked if he had anything to say prior to sentence, and he responded, "naw." (Id., PageID.908.) Again, at no point during the sentencing proceeding did Petitioner ever complain that he did not understand what was happening or express surprise that he was being sentenced.

Petitioner later requested and was appointed appellate counsel. Appellate counsel moved to withdraw the plea on the grounds that trial counsel failed to request a competency evaluation. (ECF No. 27-9, PageID.916.) Appellate counsel asserted that the medications Petitioner was on at the time of the plea might have affected the

voluntariness of his plea, and the court never asked Petitioner if he was on any medications during the plea colloquy. (Id., PageID.917-19.)

The trial court denied the motion:

> I don't find from the record that I've examined that there's any indication of ineffective assistance of counsel in trial counsel not asking to have the defendant examined forensically at an earlier stage of the proceeding. And moreover, there was, there was no indication in the, in the record at the time of the plea or the sentence that Mr. Bell was in any way incompetent to plead or that he was suffering from any kind of mental disorder that would have rendered him enable or unable to, to understand what he was doing and what the rights were he was giving up and exactly what he was doing by entering a plea. In fact, the record suggests the contrary that he was fully alert and aware of what was going on and aware of the advantages he was getting frankly by, by the plea agreement.

(Id., PageID.928.)

Petitioner filed an application for leave to appeal in the Michigan Court of Appeals, asserting one claim:

> I. The court erred by abusing its discretion in denying the defendant-appellant's motion for withdrawal of guilty plea on the fact that the plea was not voluntary, where the defendant was incompetent due to the psychiatric medication that he was taking and trial counsel being ineffective for not having defendant forensically evaluated to determine competency.

The Michigan Court of Appeals denied the application for leave to appeal "for lack of merit in the grounds presented." *People v. Bell*, No. 301422 (Mich. Ct. App. January 10, 2011). Petitioner filed an application for leave to appeal this decision in the Michigan Supreme Court, but it was denied by standard form order. *People v. Bell*, No. 142493 (Mich. Sup. Ct. May 24, 2011).

Petitioner then filed the present action, and after Respondent filed his responsive pleading, Petitioner moved to hold the petition in abeyance so his could file a motion for relief from judgment in the trial court and present the state courts with new evidence

8

that he was incompetent to plead guilty. (ECF No.7.) This court dismissed his petition without prejudice so that he could return to state court and exhaust his newly supported claim. (ECF No.11.)

Petitioner, through new counsel, then filed a motion for relief from judgment in the state trial court. Petitioner asserted that soon after he was admitted to jail, his mental state deteriorated. Jail records attached to the motion indicate that Petitioner was observed exhibiting "delirium," "confusion," and a "lack of orientation." (ECF No. 27-13, PageID.969.) Petitioner was referred to the Detroit Medical Center on October 14, 2009, a little over a week after he was committed to jail.

The Detroit Medical Center admitted Petitioner for a few days, and he was discharged on October 16, 2009. The hospital determined that Petitioner's condition was the result of sudden withdrawal from benzodiazepines he had been taking on the street: "Detoxification secondary to benzodiazepine and alcohol withdrawal. The patient started on benzodiazepine, seen by psychiatry, asked to follow up with psychiatry in Wayne County [Jail]. The patient also was put on Lithium for detoxification precaution." (Id., PageID.1019-1021.) Petitioner was prescribed a tapering dose of Xanax, a benzodiazepine, and his condition improved. (Id., PageID.1026, 1029).

About four months later, on February 18, 2010, two weeks before his plea, jail medical records indicate:

> Pt reports he was doing well on his medications, but they ran out a few days ago. Since then Pt having hard time sleeping. Feels irritable, denies [illegible] … Denies psychotic. Presents irritable w blunt affect, but appropriate. Renew meds. Effexor. But not Klonapin since Pt was taking high doses when jailed which led to withdrawal delirium.

(ECF 27-14, PageID.1062.)

9

Taking account of these new records, the trial court nonetheless denied the motion for relief from judgment. The court again found a lack of evidence to show that Petitioner's counsel should have requested a referral for a competency evaluation. (ECF No. 27-17.) Based on its observations of Petitioner at the plea hearing, the trial court found that "he was fully cognizant of what was happening and perfectly capable of looking after his own interests … nor is there any evidence that he was legally incompetent to enter a plea on March 4, 2010." (Id., PageID.1161.)

Petitioner filed an application for leave to appeal in the Michigan Court of Appeals, raising the same claim raised here, but it was denied "for failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Bell*, No. 322600 (Mich. Ct. App. Nov. 7, 2014). Petitioner appealed to the Michigan Supreme Court, but it also denied leave to appeal by form order. *People v. Bell*, No. 150779 (Mich. Sup. Ct. Sept. 9, 2015).

Rather than file a new action, as his first petition had been dismissed without prejudice, Petitioner filed an amended petition in the present case. (ECF No. 16.) The court reopened the case without prejudice to Respondent's ability to present any defenses relative to Petitioner's failure to timely file a new action. (ECF No. 25.) Respondent filed a responsive pleading, electing to contest the amended petition on the merits and expressly waiving affirmative defenses. (ECF No. 26, PageID.593-592.) The matter is now ready for decision.

## II. STANDARD

28 U.S.C. § 2254(d)(1) curtails a federal court's review of constitutional claims raised by a state prisoner in a habeas action if the claims were adjudicated on the merits

10

by the state courts. Relief is barred under this section unless the state court adjudication was "contrary to" or resulted in an "unreasonable application of" clearly established Supreme Court law.

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)).

"[T]he 'unreasonable application' prong of the statute permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal. . . . As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any

11

possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103 (internal quotation omitted).

### III. DISCUSSION

### A. Ineffective Assistance of Counsel

Three of Petitioner's six claims challenge the effectiveness of his trial attorney. Petitioner's first claim asserts that his counsel was ineffective for failing to request an evaluation regarding his competency to enter his guilty plea. His third habeas claim asserts that his counsel was ineffective for failing to adequately conduct a pretrial investigation and develop a defense to the charges. Petitioner's fourth claim asserts that his trial counsel erred in eliciting testimony during the preliminary examination that he committed the shooting with premeditation and deliberation to support a charge of first-degree murder.

A violation of the Sixth Amendment right to effective assistance of counsel is established when an attorney's performance was deficient and the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. The petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689.

An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. The petitioner must show "a reasonable probability that, but

for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Success on ineffective-assistance-of-counsel claims is relatively rare on federal habeas review, because the standard for obtaining relief "is 'difficult to meet.'" *Woodall*, 134 S.Ct. at 1702 (quoting *Metrish v. Lancaster*, 569 U.S. 351, 358 (2013)). "The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (citations and quotation marks omitted).

Petitioner first claims that his trial counsel should have challenged his competency to plead guilty. The most current version of the claim, supported with the medical records from the Detroit Medical Center and the Wayne County Jail, was presented to the state court in Petitioner's motion for relief from judgment. The trial court rejected the claim on the merits. After reviewing the records and recollecting the plea proceeding, the court made a factual determination that the evidence simply did not support Petitioner's underlying contention that he was incompetent: "[Petitioner] was fully cognizant of what was happening and perfectly capable of looking after his own interests … nor is there any evidence that he was legally incompetent to enter a plea on March 4, 2010." (ECF No. 27-17, PageID.1161.)

The standard for competency "is whether the defendant has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding'" and has "a rational as well as factual understanding of the proceedings against him." *Godinez v. Moran*, 509 U.S. 389, 396 (1993) (quoting *Dusky v. United States*, 362 U.S.

13

402 (1960)). The same standard applies for pleading guilty as it does for standing trial. *Godinez*, 509 U.S. at 397. Furthermore, "[a]n attorney has a professional duty to question a defendant's competency to stand trial if" the attorney has "a good faith doubt as to the defendant's competence." *Watkins v. Haas*, 143 F. Supp. 3d 632, 641 (E.D. Mich. 2015), rev'd on other grounds, *Watkins v. Deangelo-Kipp*, 854 F.3d 846 (6th Cir. 2017)(citing *United States v. Jackson*, 179 F. App'x. 921, 933 (6th Cir. 2006)).

Here, the record reasonably supports the trial court's determination that Petitioner's counsel had no basis for challenging Petitioner's competence. The records show that when Petitioner was first arrested in early October of 2009, he was a benzodiazepine user. The abrupt cessation of the drug upon his imprisonment caused him to experience withdrawal symptoms. The jail referred him to the Detroit Medical Center on October 14, 2009, where he was prescribed Xanax, a benzodiazepine, so that he could be weened off the drug. He was discharged a few days later. The note from the jail from February of 2010—some four months later—noted that Petitioner was doing much better. While Petitioner reported at that time that he was having a hard time sleeping and was irritable because by that point he was finally off benzodiazepines, nothing in that report suggested that he lacked sufficient ability to consult with his counsel or that he lacked a rational or factual understanding of the proceedings against him.

Petitioner's March 4, 2010, plea hearing was conducted a few weeks later, and nothing in the record of that proceeding suggests Petitioner's incompetence. Though Petitioner's statements during the plea colloquy were terse, they were appropriate and responsive. Nor is this a case where Petitioner only answered "yes" to every question

14

asked of him. He denied the existence of threats or promises to induce his plea, he answered that he did "not really" know that the deceased victim died as a result of the gunshot, and he stated that he did not intend to kill the surviving victim. Though his answers were short, their logic, variability, and responsiveness showed that he was following along with the proceeding and understood what was being asked of him. Nor did anything about Petitioner's behavior at the proceeding prompt either party or the court to raise the issue.

To refute this record, Petitioner offers only an undated letter written by Dr. Grace Patterson, MD, whose background and qualification are not given. Dr. Patterson appears to have reviewed the list of medications Petitioner was prescribed at the Detroit Medical Center. (ECF, No. 16, PageID.543-546.) Dr. Patterson states in her report that the medications Petitioner were given at the hospital might have impacted his capacity to understand the court proceedings, but she concedes, "I am unable to locate a physical evaluation and/or psychological evaluation to determine Mr. Bell's mental and physical capacity to understand and to withstand trial." (Id., PageID.543.)

Given that the medical records establish only that Petitioner suffered from withdrawal symptoms some five months before the guilty plea, that those symptoms quickly abated after treatment, and that he was observed being tired and irritable some weeks before his guilty plea, and in light of the fact that the plea colloquy does not reveal any indication of incompetence, the trial court's finding that the evidence did not support Petitioner's claim was, at least, reasonable. The only evidence offered by Petitioner in opposition to this conclusion is a letter from a doctor who summarized what medications Petitioner had been given at the hospital five months before his plea. The

15

state court reasonably rejected the claim. Petitioner has therefore failed to demonstrate entitlement to habeas relief based on his first claim under § 2254(d)(2).

Petitioner's third claim asserts that his attorney failed to investigate and present a defense that Dior was the one who shot the victims, and that he did not share Dior's intent when he drove him to the scene of the shooting. He asserts, without elaboration, that his counsel would have discovered evidence to support this contention. Petitioner's fourth claim asserts that his counsel elicited testimony during the preliminary examination that he told a witness on the phone that he was planning to shoot someone. He asserts that without this testimony, he would not have been bound over for trial on charges of first-degree murder.

These two claims are waived by Petitioner's guilty plea. An unconditional guilty plea constitutes a waiver of all pre-plea non jurisdictional constitutional deprivations. *Tollett v. Henderson*, 411 U.S. 258, 267 (1973); *U.S. v. Martin*, 526 F.3d 926, 932 (6th Cir. 2008). Pre-plea claims of ineffective assistance of trial counsel are considered non jurisdictional defects. See *United States v. Stiger*, 20 F. App'x 307, 309 (6th Cir. 2001); *Siebert v. Jackson*, 205 F. Supp. 2d 727, 733-34 (E.D. Mich. 2002).

In any event, the claims are without merit. Petitioner told multiple witnesses on the phone immediately prior to the shooting that he was going to "riddle" the victims' house. Shortly before the shooting and before the calls, the surviving victim saw Petitioner holding a gun outside the house. Petitioner claims that the deceased victims' mother somehow knew that Dior was the shooter, but she was not present at the scene of the shooting, so it difficult to see how discovering this information would have benefitted the defense, even if true. Likewise, the evidence that Petitioner planned to

16

shoot up the house with the knowledge that people were inside came from multiple witnesses he spoke with immediately before and after the shooting. These waived claims are therefore otherwise without merit.

Petitioner's has failed to demonstrate entitlement to habeas relief based on any of his claims of ineffective assistance of trial counsel.

### B. Factual Basis for Guilty Plea

Petitioner's second claim asserts that the trial court failed to obtain an adequate factual basis for the guilty plea. He asserts that no factual basis was established to show that the deceased victim died as a result of Petitioner shooting her in the head, or that he possessed any of the mental states required for second-degree murder.

The argument finds no support in the record. The parties stipulated that the victim died as the result of complications arising from being shot in the head, and Petitioner affirmed under oath that when he shot at the house he was "either intending to kill or intending to do great bodily harm or create a very high risk of death or great bodily harm to those people inside." (ECF No. 27-5, PageID.860.)

Moreover, habeas relief may not be based on a perceived violation of state law. 28 U.S.C. § 2254(a). The requirement that a trial court establish a factual basis for a guilty plea is a creature of state law. While states are free to adopt procedural rules requiring a factual basis as Michigan has done in Michigan Court Rule 6.610(E)(1)(a), the Constitution does not mandate them to do so. *See North Carolina v. Alford*, 400 U.S. 25, 37-38 (1970); *Eggers v. Warden*, 826 F.3d 873, 876 (6th Cir. 2016) (citing *Roddy v. Black*, 516 F.2d 1380, 1385 (6th Cir. 1975)). Petitioner's second claim is without merit.

### C. Preliminary Examination

Petitioner's fifth claim asserts that the state district court erred in binding him over for trial. Petitioner cannot complain about defects occurring at the preliminary examination because he waived any challenge to such errors when he entered his plea. As with Petitioner's claims of pre-plea ineffective assistance of counsel, that waiver covered any defects in a bindover. *See People v. Patterson*, 2004 Mich. App. LEXIS 2813, 2004 WL 2389896, at *4 (Mich. Ct. App. Oct. 26, 2004)("[B]y pleading nolo contendere to the homicide charge, defendant waived any right he had to challenge the sufficiency of the evidence to support . . . his bindover[.]"). Petitioner's fifth claim is without merit.

### D. Ineffective Assistance of Appellate Counsel

Petitioner's sixth and final claim asserts that on direct review his appellate counsel was ineffective for failing to fully develop and support his claim regarding trial counsel's failure to raise the competency issue. It is true that the version of the claim raised by Petitioner during his state court post-conviction review proceeding included records from the Detroit Medical Center and the Wayne County Jail that were not presented on direct review. As indicated above, however, the new records do not support Petitioner's claim. They show only that Petitioner was experiencing withdrawal symptoms months before his guilty plea, but that those symptoms abated after treatment. Because the court has determined that Petitioner's underlying claim lacks merit even considering the additional records, appellate counsel was not ineffective for failing to include them on direct review. Counsel is not ineffective for failing to raise a meritless claim on direct review. *Bennett v. Brewer*, 940 F.3d 279, 286 (6th Cir. 2019).

As none of Petitioner's claims merit relief, the petition will be denied.

## IV. CERTIFICATE OF APPEALABILITY

Before Petitioner may appeal this decision, the court must determine whether to issue a certificate of appealability. See 28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To satisfy § 2253(c)(2), Petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citation and internal quotation marks omitted). The court finds that reasonable jurists would not debate the resolution of any of Petitioner's claims. The court will therefore deny a certificate of appealability.

## V. CONCLUSION

Accordingly, IT IS ORDERED that the petition for a writ of habeas corpus is DENIED. IT IS FURTHER ORDERED that a certificate of appealability is also DENIED.

s/Robert H. Cleland            /
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated: November 2, 2020

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, November 2, 2020, by electronic and/or ordinary mail.

s/Lisa Wagner            /
Case Manager and Deputy Clerk
(810) 292-6522

C:\Users\christydral\Documents\11-14604.BELL.2254.bb.chd.docx